United States District Court
District of Massachusetts

|  |  |  |
|---|---|---|
| CPI CARD GROUP - COLORADO, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 14-13435-NMG |
| MICHELLE LEHOUCK, | ) ) ) | |
| Defendant. | ) ) | |

**MEMORANDUM & ORDER**

**GORTON, J.**

This case arises out of an alleged a breach of an employment confidentiality agreement. Plaintiff CPI Card Group - Colorado, Inc. ("CPI") is a plastic payment card (e.g. credit card) production company that also provides related services to its customers. Defendant Michelle Lehouck ("Lehouck") is a former Senior Manager at CPI who was employed at the company from November, 2007 until May, 2014.

Pending before the Court is the plaintiff's motion for a preliminary injunction to preclude Lehouck from continuing to use CPI's confidential and proprietary business information in violation of her Confidentiality Agreement ("Agreement") with CPI. For the reasons that follow, plaintiff's motion will be granted, though the requested scope of the preliminary injunction has been modified.

## III. **Background**

Plaintiff CPI is a global leader in the plastic payment card (e.g. credit card) production industry. Among other things, it manufactures EMV-enabled payment cards, which are cards with embedded computer chips that provide a higher level of security than magnetic-stripe payment cards and are customizable to specific client needs.[1] The major credit card brands have announced that they will shift liability for counterfeit fraud onto credit card issuers and merchants who do not adopt EMV-enabled systems starting on October 1, 2015. The EMV-enabled card migration has thus been a lucrative business opportunity for CPI. CPI has been required by its current and prospective customers to execute non-disclosure agreements with respect to migration proposals and other work performed for them.

From July, 2013 until her resignation from the company, Lehouck worked as a Senior Manager for EMV Technologies in CPI's Global Strategic Marketing Team. Throughout her employment at CPI, Lehouck provided expert support to the EMV sales teams and was the primary customer contact. She had access to confidential information related to customers' EMV migration plans, including 1) the identities and contact information of

---

[1] EMV is an acronym resulting from the original developers Europay, MasterCard and Visa.

key decision-makers, 2) business, marketing and information technology plans and 3) project and proposal specifications. At CPI, she also had access to the company's 1) marketing and pricing of products and services, 2) business plans, 3) customers and prospective customers, 4) proposals to customers and prospective customers and 5) the terms of agreements with customers.

Following her resignation from CPI, Lehouck became the U.S. EMV Product Director for Bell Identification B.V. ("Bell ID"). Bell ID is a software company providing mobile payment solutions. It supports many financial institutions with respect to their migration from magnetic strips to EMV chip technology. Lehouck's primary role at Bell ID is to develop business for the company's EMV data preparation/lifecycle management software.

**A.   Lehouck's Confidentiality Agreement with CPI**

At the outset of her employment at CPI, Lehouck signed the Agreement at issue in this case. Section 1, titled "Confidentiality - Trade Secrets," provided that she shall not at any time disclose or use CPI's confidential information and trade secrets, including the identities and contact information of CPI's customers and potential customers, confidential information on CPI's products and services and confidential CPI marketing and pricing information.

Section 3 of the Agreement, titled "Unfair Competition," provided that for a period of one year following the termination of employment, Lehouck will not directly or indirectly divert, attempt to divert, solicit, or attempt to solicit any of CPI's customers, "including but not limited to those [with] whom [s]he became acquainted while engaged as an Employee...."  In the event of a breach, the Agreement provides for injunctive relief in addition to any other remedy.

### B. Alleged breach of Agreement

CPI alleges that Lehouck violated the Agreement after she began working for Bell ID.  Plaintiff contends that Lehouck used confidential CPI information, including customer contact information, to divert corporate opportunities from CPI and to sell Bell ID's EMV-related products and services to CPI's customers and prospective customers.  Specifically, CPI alleges that Lehouck 1) reached out to a CPI employee to obtain contact information for one of its customers, 2) contacted three of CPI's customers and drew on her knowledge of CPI's confidential information in an attempt to sell Bell ID's products to them and 3) continuously solicited one of CPI's prospective customers and used her knowledge of CPI's confidential information to sell Bell ID's products, which directly caused CPI to lose that potential business.

When CPI's outside counsel sent Lehouck a cease-and-desist letter asking her to confirm her intention to abide by the confidentiality and non-solicitation provisions of the Agreement, Bell ID's outside counsel responded by stating that the Agreement was void and unenforceable under Colorado law. Furthermore, counsel asserted that the contact information of the three CPI customers was not protected by trade secret because the identity of each had been publicly disclosed.

### C. Choice of law

Both parties agree that the Agreement should be interpreted under Colorado law, in accordance with the choice of law provision in the Agreement. There are no public policy reasons counseling against the application of Colorado law to the Agreement.

### D. Procedural History

Plaintiff CPI filed the instant lawsuit on August 22, 2014. It moved for a preliminary injunction on the same day. The Court heard argument on the plaintiff's motion on September 11, 2014. After hearing argument by each party, the Court indicated that it was inclined to enter a preliminary injunction to prevent defendant from disclosing CPI's trades secrets and confidential information. It urged the parties to agree upon a limited injunction and to submit a joint proposed order by September 19, 2014. The parties have been unable to do so.

**IV. <u>Plaintiff's Motion for a Preliminary Injunction</u>**

    **A. Legal Standard**

In order to obtain a preliminary injunction, the moving party must establish

> (1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships and (4) a fit (or lack of friction) between the injunction and the public interest.

<u>Nieves-Marquez</u> v. <u>Puerto Rico</u>, 353 F.3d 108, 120 (1st Cir. 2003) (citation omitted). Out of these factors, the likelihood of success on the merits "normally weighs heaviest on the decisional scales." <u>Coquico, Inc.</u> v. <u>Rodriguez-Miranda</u>, 562 F.3d 62, 66 (1st Cir. 2009).

The Court may accept as true "well-pleaded allegations [in the complaint] and uncontroverted affidavits." <u>Rohm & Haas Elec. Materials, LLC</u> v. <u>Elec. Circuits</u>, 759 F. Supp. 2d 110, 114, n.2 (D. Mass. 2010) (quoting <u>Elrod</u> v. <u>Burns</u>, 427 U.S. 347, 350, n.1 (1976). The Court may also rely on otherwise inadmissible evidence, including hearsay, in deciding a motion for preliminary injunction. <u>See</u> <u>Asseo</u> v. <u>Pan American Grain Co., Inc.</u>, 805 F.2d 23, 26 (1st Cir. 1986).

    **B. Application**

        **1. Likelihood of Success**

CPI maintains that it is likely to succeed on the merits of its claims because 1) the non-solicitation and confidentiality

provisions in the Agreement are enforceable under Colorado law, 2) CPI's confidential information constitutes trade secrets under Colorado law and 3) Lehouck has breached her Agreement with CPI.  All three arguments are contested by Lehouck.

        **a.   Direct competitors**

As a preliminary matter, Lehouck argues that CPI cannot show a likelihood of success on the merits because CPI and Bell ID are not competitors.  Instead, defendant claims that card manufacturers like CPI are Bell ID's potential customers.  While CPI is a payment card manufacturer, Bell ID is exclusively a software developer for devices that interface with EMV-enabled payment cards, among other applications.  Lehouck asserts that there is no meaningful competition even though CPI and Bell ID serve the same kinds of customers.

CPI has explained, both at oral argument and in an affidavit, that the companies are direct competitors in many areas within the EMV migration marketplace.  CPI and Bell ID are direct competitors with respect to 1) EMV-enabled credit and debit card mobile payment solutions, 2) data preparation services, 3) personalization services, 4) key management solutions, which is the process of creating and maintaining keys for encrypted transport and storage of data, 5) secure trusted service manager services, which enables secure transmission of

data and 6) EMV consulting services to customers throughout the EMV migration process.

The Court concludes that CPI has demonstrated that the businesses do overlap significantly and that CPI and Bell ID are direct competitors in many respects.

### b.     Enforceability of the Agreement

Under Colorado law,

> [a]ny covenant not to compete which restricts the right of any person to receive compensation for performance of skilled or unskilled labor for any employer shall be void, but this subsection [] shall not apply to...(b) Any contract for the protection of trade secrets....

Colo. Rev. Stat. § 8-2-113(2).  An agreement not to solicit customers is considered a form of covenant not to compete. Saturn Sys., Inc. v. Militare, 252 P.3d 516, 526 (Colo. App. 2011) (citation omitted).  Such a provision is enforceable so long as 1) its purpose is to protect the employer's trade secrets and 2) is reasonably limited in time and geographic scope. Id.

Colorado courts have looked to the preamble and the substantive provisions of the contract to determine whether a restriction was drafted with the purpose of protecting trade secrets. See Haggard v. Spine, 2009 WL 1655030, at *5 (D. Colo. June 12, 2009).  In the "RECITALS" section of the Agreement, the defendant acknowledged that CPI

uses information and data which it has developed or
acquired at great expense and effort....It is important to
[CPI] that such information and data be solely for the
benefit of [CPI]...and shall remain confidential at all
times during and after the term of Employee's employment...

Section 1 of the Agreement, titled "Confidentiality - Trade Secrets," is dedicated to describing the proprietary information that the document seeks to protect. Moreover, there are no other provisions in the Agreement regarding unrelated subjects, such as job responsibilities or salary. The language in the Agreement signed by Lehouck indicates that the purpose of the contract was to protect trade secrets.

The Court concludes that the Agreement also meets the second prong of the trade secret statutory exception because it is reasonably limited in scope. Section 3, titled "Unfair Competition," precludes Lehouck from soliciting CPI's customers for just one year, which is "well within the realm of enforceable agreements." Haggard, 2009 WL 1655030, at *10; see also Taff v. Brayman, 518 P.2d 298 (Colo. App. 1974)(upholding a two-year noncompetition restriction).

Furthermore, the terms of the Agreement do not limit defendant from working for any other company, so long as she does not engage in activity that would call on her "to use any of [CPI's] Confidential Information or trade secrets." Although the Agreement lacks a geographic limitation, CPI contends that the language is justified due to the global nature of companies

involved in the EMV migration business and the defendant's contact with customers that have a global reach. Colorado courts, while weary of restrictive covenants without geographic limitations, have not found it to be dispositive and have been able to interpret those provisions more narrowly without deeming them invalid under the statute. See, e.g., Haggard, 2009 WL 1655030, at *10 ("The fact that the restrictive covenants meet the statutory exception does not end the analysis....As such, the worldwide restriction on solicitation is unreasonably broad.") Following the example set in Haggard, this Court will also interpret the non-solicitation provision more narrowly, to preclude Lehouck from contacting only those customers with whom she had actual contact during her employment at CPI, rather than preventing her from soliciting all CPI customers and potential customers. See id. at *11.

Having determined that the Agreement is enforceable under Colorado law, the Court will now proceed to consider whether Lehouck utilized information that constitutes trade secrets, in violation of her Agreement.

  **c. Trade secrets**

The Colorado Uniform Trade Secrets Act defines a trade secret as:

> the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, improvement, confidential business or

financial information, listing of names, addresses, or telephone numbers or other information relating to any business or profession which is secret and of value. To be a "trade secret" the owner thereof must have taken measures to prevent the secret from becoming available to persons other than those selected by the owner to have access thereto for limited purposes.

Colo. Rev. Stat. § 7-74-102(4). Colorado courts consider a number of factors in determining whether information warrants trade secret protection. These factors include:

> 1) the extent to which the information is known outside the business, 2) the extent to which it is known to those inside the business, i.e., by the employees, 3) the precautions taken by the holder of the trade secret to guard the secrecy of the information, 4) the savings effected and the value to the holder in having the information as against competitors, 5) the amount of effort or money expended in obtaining and developing the information, and 6) the amount of time and expense it would take for others to acquire and duplicate the information.

Porter Indus., Inc. v. Higgins, 680 P.2d 1339, 1341 (Colo. App. 1984).

CPI asserts that its confidential information, including 1) the identities and contact information of key decision-makers, 2) business, marketing and information technology plans and 3) project and proposal specifications, constitutes trade secrets. CPI notes that it has invested significant resources in developing and marketing its EMV-related technology. As a result of its efforts, it has aggregated significant amounts of information on its customers' EMV-migration plans. CPI has taken measures to protect such information, including requiring

-11-

employees to sign Confidentiality Agreements, requiring employees to relinquish all CPI property upon the termination of their employment and maintaining extensive external and internal security systems.

Lehouck disputes that the terms describing CPI's trade secrets and confidential information in the Agreement meet the requisite level of particularity necessary for trade secret protection. She asserts that the descriptions in the Agreement, with the possible exception of identities of customers and their key decision-makers, are overly vague and therefore the non-solicitation provision of the Agreement is unenforceable under Colorado law.

Lehouck's assessment is unpersuasive. The Agreement lists specific areas of information that constitute CPI's trade secrets, including

> the names, addresses, telephone numbers of customers, their buying habits, terms of sale extended to customers, including credit terms, if any, or other practices of any of Company's customers [and] Company's marketing methods, related information and the costs thereof.

A company's confidential information consisting of "client lists, customer contracts, pricing information, detailed debtor information, client information and customer log-in codes" has been found to qualify as trade secrets. Saturn Sys., 252 P.3d at

-12-

527. CPI describes its trade secrets in a similar manner and thus they do not appear to be overly vague.

The defendant also contends that the names of a number of CPI customers, including the ones she contacted, are not trade secrets because they were publicly disclosed as customers or otherwise publically known to be potential EMV migration customers. For example, CPI referred to Interactive Communications International ("InComm") as one of its "partners." The same relationship was disclosed on the Paybefore.com website on January 20, 2014 in which CPI was referred to as a "partner" of InComm. Lehouck also asserts that the members of the EMV Migration Forum, a group created by the Smart Card Alliance in July, 2012 to address issues that require cooperation and coordination to introduce secure EMV contact and contactless technology in the United States, are publicly known and therefore she should not be restrained from contacting the 12 CPI's customers participating in the Forum.

Lehouck alleges that Colorado has found that the intermittent provision of customer leads and other shared customer information is not a trade secret, even if the entirety of customer information contained in a database might be a trade secret. Frontrange Solutions USA, Inc. v. Newroad Software, Inc., 505 F. Supp. 2d 821, 836 (D. Colo. 2007). In Frontrange, the company seeking to protect its customer database through

trade secrecy had prominently advertised "the identities of many of its customers on its website as a marketing tool," had permitted "free sharing of customer information at its user group meetings and at supplier-sponsored events," and others could "obtain this information without restriction at trade shows." Id. at 837.

However, CPI is distinguishable because it has not advertised its customer relationships to the extent publicized by the plaintiff in Frontrange. Listing a company as a "partner" does not necessarily indicate that the company is a customer of CPI. CPI has also taken precautionary measures to protect its confidential information through maintaining extensive external and internal security systems, requiring employees to sign Confidentiality Agreements and requiring employees to relinquish all CPI property upon termination of their employment.

More importantly, throughout her years of employment at CPI, Lehouck learned not only the identities and contact information of CPI's customers, but also their strategies, buying preferences, pricing requirements, technical specifications and long-term plans. No public listing would give a salesperson that level of insight. See Haggard, 2009 WL 1655030, at *9 (rejecting the argument that customer contact information could not be trade secret simply because it was

obtainable from the internet and finding that relationships with customers and knowledge of their business preferences and primary contacts that were developed through the employment were protected as trade secrets). Thus, the confidential information categories enumerated in the Agreement, including customer information, constitute trade secrets.

### d. Breach of the Agreement

CPI alleges that Lehouck initiated contact with three CPI customers and that she used her knowledge of CPI's confidential information to divert business away from CPI. Plaintiff informed the Court at the September, 2014 hearing that in addition to using her knowledge of the identities of and contact information for the customers, Lehouck also relied on her acquired knowledge of the customers' needs and concerns during the EMV migration in her attempt to lure them away to Bell ID. CPI provided examples of two emails written by Lehouck to CPI customers in which she urged them to conduct "side by side" comparisons of a CPI product and a Bell ID product.

Lehouck disputes that she used any of CPI's confidential information during her contacts with the customers. She asserts that none of the emails she sent revealed any trade secrets belonging to CPI. The evidence brought forth by the plaintiff, however, suggests otherwise. Even if she did not explicitly reveal confidential information in the emails, Lehouck

necessarily relied on the knowledge that she developed while employed at CPI in order to address the customers' concerns and attempt to dissuade them from purchasing the CPI product in favor of the Bell ID product.

The Court concludes that plaintiff is likely to prove that the defendant improperly used CPI confidential information following her resignation from CPI. That is so because Lehouck is unlikely to be able to separate out her intimate knowledge of CPI's confidential information and trade secrets in her attempt to sell Bell ID's products to the same customers.

### 2. Remaining factors

#### a. Irreparable harm

Irreparable injury is "a substantial injury that is not accurately measureable or adequately compensable by money damages." Ross-Simons of Warwick v. Baccarat, Inc., 102 F.3d 12, 19 (1st Cir. 1996). Plaintiffs alleging irreparable injury must show more than a "tenuous or overly speculative forecast of anticipated harm." Id. Examples of irreparable injuries include loss of incalculable revenue and harm to goodwill or reputation. Id. at 19-20. In the preliminary injunction context, the First Circuit Court of Appeals measures irreparable harm

> on a sliding scale, working in conjunction with a moving party's likelihood of success on the merits, such that the strength of the showing necessary on irreparable harm depends in part on the degree of likelihood of success shown.

Braintree Labs, 622 F.3d at 42-43 (internal quotation marks and citations omitted).

CPI asserts that there is a significant risk of irreparable harm if the Court does not grant the preliminary injunction due to the October 1, 2015 deadline imposed by major credit card payment brands for credit card issuers and merchants to upgrade their systems to accept EMV-enabled cards. Once that deadline has passed, many of the major credit card issuers and merchants will already have their EMV technologies in place and the opportunity to compete for these customers will have passed. The unique time-sensitive nature of the EMV migration makes potential damages suffered by CPI difficult to calculate.

Lehouck responds that even if the Court finds that the plaintiff has shown a likelihood of success on the merits, CPI will not suffer irreparable harm if it does not receive a preliminary injunction because it can receive an adequate remedy at law in the form of pecuniary damages for lost profits after trial.

Defendant's argument fails to acknowledge that a loss of confidentiality of trade secrets and loss of competitive position does not merely decrease a company's profits. It affects the company's position in the marketplace and its goodwill with customers which are difficult to quantify

monetarily. As such, CPI is likely to be able to demonstrate that it will suffer irreparable harm if defendant is not enjoined from violating her Agreement.

### b. Balance of harms

Pursuant to the terms of the Agreement, the restrictions placed on the defendant end one year after separation. Any injunction imposed, therefore, has a finite termination date. Although defendant would be precluded from soliciting a limited number of CPI's customers until that date, there are numerous other business prospects, many of which are listed as members in the EMV Migration Forum.

### c. Public interest

The fourth element requires plaintiff to show that entry of a preliminary injunction would not be adverse to the public interest. Although Colorado disfavors noncompetition agreements, the Colorado legislature has created an exception to the prohibition when the agreement relates to the protection of trade secrets. See Colo. Rev. Stat. § 7-74-102(4). Thus, a preliminary injunction enforcing the confidentiality and non-solicitation provisions of the Agreement does not violate the public interest.

## C. Security under Fed. R. Civ. P. 65(c)

A movant for a preliminary injunction must give "security in an amount that the court considers proper to pay the costs

and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). At the September, 2014 hearing, the plaintiff suggested a security in the amount of $10,000 while the defendant suggested a range of $50,000 to $100,000. Those numbers were calculated based on a representation that defendant earns about $150,000 per year. Following the hearing, the defendant submitted a supplemental memorandum in opposition to the plaintiff's motion for preliminary injunction in which she requested a security of $840,000. She derives that figure based on the assumption that she would receive a maximum commission on sales to all 23 companies that CPI seeks to enjoin Lehouck from contacting. The Court finds Lehouck's assumption to be unrealistic and deems $50,000 to be an appropriate security.

## ORDER

For the reasons stated in the Memorandum, the Court concludes that the plaintiff has demonstrated that 1) it is likely to succeed on the merits of its claim, 2) it will suffer irreparable harm in the absence of injunctive relief, 3) the balance of hardships is in its favor and 4) there is a fit (or lack of friction) between the injunction and the public interest. See Nieves-Márquez v. Puerto Rico, 353 F.3d 108, 120 (1st Cir. 2003). Accordingly, plaintiff's motion for a preliminary injunction (Docket No. 3) is **ALLOWED**.

**So ordered.**

/s/ Nathaniel M. Gorton  
Nathaniel M. Gorton  
United States District Judge

Dated October 8, 2014